LAURA M. CARTER, Plaintiff-Appellee, v. OLIVER KIRK, JR., *et al.*, Defendants-Appellants.

First District (5th Division)   No. 1—92—3809

Opinion filed November 12, 1993.

Law Office of Douglas J. Laurent, of Chicago, for appellants.

Charles W. Nixon, of Chicago, for appellee.

JUSTICE MURRAY delivered the opinion of the court:

Plaintiff, Laura M. Carter (Laura), brought this suit to recover damages for personal injuries she sustained as a result of a motor vehicle accident on October 11, 1989. The jury returned a verdict in the amount of $50,848 for the plaintiff as compensation for her injuries. Judgment was entered on the verdict. Upon motion of the defendants, the trial judge entered an order for a remittitur in the amount of $20,000. Plaintiff consented to the remittitur and judgment was entered in the amount of $30,848. Notwithstanding the order of remittitur, defendants filed an appeal from the denial of their alternative request for a new trial. Plaintiff cross-appeals from the granting of the defendant's motion for a remittitur.

On October 11, 1989, defendant, Oliver Kirk, Jr. (Kirk), was involved in a motor vehicle accident. At the time of the accident Kirk was employed by Bill's Excavating and Landscaping Service, owned by defendant William H. Schopf II. Kirk was driving on an approved route, going where he was ordered to go for the benefit of Mr. Schopf. The accident occurred when defendant's truck struck the rear of Thomas Pletzke's automobile, which then hit the rear of Gordon Keith Powell, Jr.'s stopped automobile, which then bumped the rear of the plaintiff's automobile. None of the drivers of the other three vehicles claimed to have suffered any injuries as a result of this

accident. The rear of Mr. Pletzke's automobile was damaged and he was compensated for those damages. Neither the front of Pletzke's car, nor Powell's car, nor Laura Carter's car suffered visible damage.

Plaintiff's aunt, Neaïce Craft (Neaice), testified that on October 12, 1989, she went to her niece Laura's home. Plaintiff was walking very slowly, leaning on Neaice's shoulder and on some of the furniture. This was unusual behavior for the plaintiff. Laura told Neaice that she had been involved in a car accident the day before and gave Neaice her arm to rub and try to get the circulation back. Neaice stayed with Laura in the house for two months and every time the plaintiff would go to sleep, Neaice massaged her hands, fingers, and her arm. When she massaged the side of Laura's back she could "feel little lumps there like hard places." Neaice accompanied Laura to doctor visits and to physical therapy. On cross-examination, Neaice testified that during the period of time that Laura would lean on her to walk around, Laura never used a cane, crutches, or a walker to help her walk. Two months after the accident, Laura did not return to work, instead Neaice would do Laura's work for her. Neaice cleaned Mrs. Ruggiero's house and apartment buildings. For two months Laura was paid by Mrs. Ruggiero and Laura in turn paid Neaice.

Plaintiff's counsel asked Neaice if Laura was responsible for her own mortgage payments and food, whether she knew if Laura owned a home in Justine and "whether or not after this accident a foreclosure suit was brought to the mortgage." The trial court sustained objections to each of these questions and instructed the jury to disregard.

Joe Wilcox testified that around February 1990 he began doing some work for Laura. He vacuumed hallways and stairwells. He believed Mrs. Ruggiero owned the property where he worked; however, he was not paid by Mrs. Ruggiero, he was paid by Laura. Since February 1990 Mr. Wilcox has continued to work one day a week for Laura doing the heavy work, like vacuuming.

Dr. James Herron testified that he first treated the plaintiff on November 7, 1991. Laura had told him she had been involved in an auto accident in 1989, at which time she injured her neck, her upper back, her lower back and her shoulders. Dr. Herron did a physical examination, X rays on the areas he deemed necessary, and then prescribed a course of treatment. Although he found no abnormalities on the X rays, he found some tenderness and spasm over the trapezius muscles, some swelling with movement of the muscle and some decreased range of motion of her neck muscles. Dr. Herron diagnosed chronic cervical sprain, a chronic sprain of her dorsal spine, chronic sprain of her shoulders, and chronic sprain of her lower back. Dr.

Herron concluded that Laura's injuries were caused by the auto accident in 1989.

The trial court allowed the plaintiff to show Dr. Herron Laura's medical records from Dr. Sawlani. The jury was instructed that the records were being admitted for the sole purpose of enabling the jury to evaluate the opinion of Dr. Herron since the records formed the basis of his opinion. Laura's medical records indicated she visited Dr. Sawlani on October 11, 1989, at which time she told the doctor she was involved in an auto accident. Dr. Herron testified that the report of Laura's injuries was consistent with his findings in 1991. Dr. Herron testified it was possible for the injuries of October 11, 1989, to require a person to be off work for two months and that the type of injuries would be consistent with a person having substantial difficulties vacuuming 100 or more flights of stairs and mopping floors. Dr. Herron was unable to determine whether or not Laura would have a problem in the future.

On cross-examination Dr. Herron testified that his diagnosis was consistent with what the other records he saw indicated and that over two years after the accident there was swelling, even though the record from Marquette Physical Therapy indicated no swelling. Dr. Herron testified that after the accident Laura could have no swelling, yet two years later she could have swelling which he considered to be part of the accident. Dr. Herron also testified that the swelling could have been caused by other reasons during those two years. A part of the diagnosis relies on the patient's history, so Dr. Herron's diagnosis depended on what he was told by Laura. Dr. Herron testified that he looked at Dr. Schiappa's records, wherein it was recorded on December 12, 1989, "Doing well, no pain." Dr. Herron testified that these are things that can come and go and you can feel much improved and then get worse. Dr. Herron was the only doctor to testify in this case.

Chatka Ruggiero testified she is a real estate investor. She owns a shopping center and apartment buildings. Laura Carter had worked cleaning her home and the hallways in her apartment buildings for approximately eight years. On October 11, 1989, Mrs. Ruggiero was informed Laura was injured and would be taking off work. Approximately two weeks later, when Laura returned to work, she would bring a helper along. Neaice Craft was one of Laura's helpers. Laura would bring Neaice to help at the house and Joe Wilcox to help at the apartment buildings. After her injury Laura would drop valuable pieces of property. When asked what had happened, Laura would blame the cat. Mrs. Ruggiero also testified that Laura was a little disoriented at times. In 1988 Mrs. Ruggiero paid Laura $7,224.87; in

1989, when Laura didn't work two months, she paid her $8,408.50, and in 1990 Laura was paid $7,239.63.

Laura Carter testified that on October 11, 1989, she was stopped at a red light when her car was hit from behind. Laura's forehead hit the sun visor. At the time of the accident Laura was wearing her seatbelt and the sun visor was up. Immediately after the accident Laura told a police officer she had only hit her head, but she wasn't hurt and she felt all right. However, after Laura arrived at work that day, she started getting sick, she was dizzy and she felt like she wanted to throw up. Laura went to see Dr. Sawlani that day. Dr. Sawlani took X rays and gave her some medicine. Laura saw Dr. Sawlani several times before he sent her to Dr. Schiappa. Over the course of seven or eight weeks, Dr. Schiappa gave Laura massages and treatments on her back and sent her to Marquette Physical Therapy. After this treatment Laura felt better and she tried to go back to work.

The day after the accident Laura felt "awful bad," she couldn't move, like she was paralyzed, and she had pain in her neck, shoulder and back. Her aunt, Neaice Craft, came over that day. Her aunt was at Laura's home quite often, about every day for about two months. When Laura first tried going back to work, she attempted to go to Lake Geneva. Laura got lost for five hours and was five hours late. After Laura returned, she then went to work for Mrs. Ruggiero for a couple of days. Laura brought Neaice along as a helper for a couple of months. Joe Wilcox would also help Laura do her work.

Laura testified that the pain never left her until May 3, 1992. She realized the pain had left when she "got up Sunday morning and got out of pain." Prior to May 3, 1992, she had pain all through the night as well as difficulty sleeping and driving her car. After driving for a period of time, Laura had pain in her back and down her arm. She would also get a fever in her back which would cause swelling in her back and cut the blood circulation off. This condition caused her to drift from one side of the road to the other, and she would get totally lost. Since May 3, although the pain left her back, she has had "a swelling in my back that caused the blood circulation to get cut off from my brain and causes me to lose my memory."

In November 1991 Laura went to see Dr. Herron. Laura testified that she did not injure herself between the time of the accident and the time she first saw Dr. Herron. When she drives a car today she is worried someone will hit her. Plaintiff's counsel asked Laura if she had "any other worries or concerns, any more mental suffering concerning your health, for example, after this accident." Plaintiff responded, "Yes, my bills, I'm wondering if I am going to be able to

keep on working, you know, so I can pay my bills and stuff." Plaintiff's counsel then asked if she had "anything else physically happen besides what you have described after this accident." Laura responded, "Since this accident, I have lost most of my hair and everything, and because, you know my bills and stuff, foreclosure on my home, car being repossessed because I'm not able to meet my bills and stuff."

Laura further testified that in October 1989 she worked for Chatka Ruggiero, Lou, Gregory Choyce and Buddy cleaning houses and apartments. Laura would clean Mrs. Ruggiero's home and she would vacuum and mop the hallways and stairways in Mrs. Ruggiero's apartment buildings. Laura testified that the total amount of earnings she had lost to date was $5,956 and she had lost the job in Lake Geneva entirely. On cross-examination, plaintiff testified that although she worked for several people, she only reported income from Mrs. Ruggiero on her tax return. Laura indicated that the reason she made more money in 1989 when she had lost two months of work was due to the holidays; she worked as a cook.

Mr. Pletzke testified that he was compensated for the damage to his car and that it was about $1,350. In his opinion the amount he received was a fair and reasonable amount to take care of his car. During cross-examination plaintiff's counsel asked if he had submitted a claim for $1,600. When Pletzke replied yes, plaintiff's counsel than stated, "They only paid you what, 1300 something, right?" In addition during closing arguments, plaintiff's counsel stated, "I don't know now about Mr. Pletzke, he says his estimate was $1600. I mean, you know, not enough money, not enough that you can file a suit, but they can still chisel him down to 1300, to a few bucks—." Defense counsel objected. The trial court sustained the objection and instructed the jury that it should disregard the information because what happened between someone else was irrelevant to the issues in the case.

On plaintiff's motion at the close of the evidence, the trial judge entered a directed finding as to defendants' negligence and that plaintiff was not negligent. On July 13, 1992, the jury returned a verdict in the amount of $50,848, said amount representing $27,500 for disability, $15,000 for pain and suffering, $4,422 for medical expenses, and $3,926 for lost earnings.

Defendants filed a post-trial motion requesting a new trial on damages only or in the alternative a remittitur on the issue of damages. The trial court granted defendants' post-trial motion for a remittitur and allowed the plaintiff 28 days to consent or the defendant would be granted a new trial. The plaintiff consented to a remittitur

and on September 24, 1992, the trial judge entered an order which (1) vacated the judgment of July 13, 1992, (2) added interest at 9% for 45 days on $30,848 in the amount of $342 for the period from July 13, 1992, through August 27, 1992, and (3) assessed costs of $188.76 against the defendants.

Defendants present two issues on appeal. First, defendants argue the trial court should have granted their motion for a new trial and, second, that the trial court erred in awarding interest on the damage award from July 13, 1992, to August 27, 1992. Plaintiff has filed a cross-appeal and argues that the trial court erred in granting a remittitur.

For the following reasons, we affirm in part and reverse in part.

I

■ Defendants argue the trial court erred in denying their motion for a new trial on damages only, and base this argument on "the cumulative effect of plaintiff's action which denied the defendants a fair trial." However, "[t]he right to appeal exists only in favor of a party whose rights have been prejudiced by the judgment or decree appealed from." (*Clay v. Pepper Construction Co.* (1990), 205 Ill. App. 3d 1018, 1022, 563 N.E.2d 937.) The defendants requested a new trial on damages only or in the alternative a remittitur. The trial court granted the defendants one of the two options for relief they sought, a remittitur. The defendants did not propose to the trial court an amount the verdict should be reduced (although we assume they would have liked the verdict reduced to zero) and have not argued to this court that the amount of the remittitur was insufficient. Since the defendants were granted the relief they requested, *i.e.*, a remittitur, we do not believe their rights were prejudiced. Thus, we do not believe the defendants have the standing to appeal the trial court's failure to grant their alternative request.

II

On July 13, 1992, a jury verdict was returned and judgment entered in the amount of $50,848. On August 27, 1992, the trial court entered an order granting the defendants' post-trial motion and ordered a remittitur of $20,000, or if plaintiff did not agree to the remittitur, the defendants would be granted a new trial on damages only. Plaintiff was granted 28 days to decide. On September 24, 1992, the plaintiff's consent to the remittitur was filed and judgment entered in the amount of $30,848. The trial judge also ordered defendants to pay interest at the rate of 9% from July 13, 1992, to August 27, 1992. The defendants argue the trial court's award of

interest was error. Alternatively, plaintiff argues interest should run from the date the verdict was rendered. Plaintiff contends that although interest was awarded from the time the verdict was rendered, the trial court committed error when it refused to order interest from August 27, 1992, to September 24, 1992.

The defendants argue the granting of interest for the time period prior to plaintiff's consent to a remittitur rather than a new trial on damages is improper since there was no final judgment in the amount of $30,848 prior to September 24, 1992. Defendants point out that it would be impractical as well as unfair to a party to have to pay interest prior to the date that the judgment was entered based upon the consent to the reduction of the judgment, since if the plaintiff had refused the remittitur, the trial judge would have granted the defendants' motion for a new trial. The defendants further argue that there definitely should be no interest owing from August 27, 1992, through September 24, 1992 (the time period requested by· plaintiff's counsel from the time defendants' post-trial motion was granted to the date plaintiff filed her consent to the remittitur), as the defendants had no control over when the plaintiff would make her decision. Defendants maintain that when the plaintiff filed her consent to remittitur, the judgment of July 13, 1992, was vacated, and where the judgment was based on the consent of the plaintiff, rather than accepting a new trial on the issue of damages, the interest should only start to run from the date that the judgment consented to was entered.

■ Section 2—1303 provides in pertinent part:

"When judgment is entered upon any award, report or verdict, interest shall be computed at the above rate, from the time when made or rendered to the time of entering judgment upon the same, and included in the judgment. *** The judgment debtor may by tender of payment of judgment, costs and interest accrued to the date of tender, stop the further accrual of interest on such judgment notwithstanding the prosecution of an appeal, or other steps to reverse, vacate or modify the judgment." (Ill. Rev. Stat. 1991, ch. 110, par. 2—1303.)

We have found no cases which directly address the issue of whether interest should be ordered from the time a jury verdict is returned through the time when the trial court orders the plaintiff to choose between a new trial on damages and a remittitur. The only cases we have found deal with interest during the pendency of an appeal.

The plaintiff cites *Phelps v. O'Malley* (1989), 187 Ill. App. 3d 150, 543 N.E.2d 311, wherein interest was ordered to accrue from the date of the original judgment in the trial court even though the appellate

court lowered the award on appeal. In *Phelps*, the appellate court affirmed the finding of liability, but set damages at a lower amount. The court distinguished *Rosenbaum v. Rosenbaum* (1981), 94 Ill. App. 3d 352, 418 N.E.2d 939, and *Presbyterian Distribution Service v. Chicago National Bank* (1962), 36 Ill. App. 2d 1, 183 N.E.2d 525, in that in *Phelps* the mandate of the appellate court did not leave damages undetermined.

An award of interest on a money judgment requires that the amount of money owed is certain and that the judgement debtor enjoyed use of the money during the period for which interest is to be awarded. (*Robinson v. Robinson* (1986), 140 Ill. App. 3d 610, 611, 488 N.E.2d 1349.) Where the exact amount owed is not calculated until the disposition of the case following a remandment from a reviewing court, interest on the judgment begins to run from the date of the new decree. *Rosenbaum v. Rosenbaum* (1981), 94 Ill. App. 3d 352, 356, 418 N.E.2d 939; *Thatch v. Missouri Pacific R.R. Co.* (1979), 69 Ill. App. 3d 48, 52-53, 386 N.E.2d 1180.

In *People v. Johnson* (1981), 87 Ill. 2d 98, 429 N.E.2d 497, two attorneys were appointed to represent indigent defendants. Subsequent to the disposition of the cases, the attorneys filed verified petitions for fees and expenses. The trial court awarded the attorneys an amount for fees which the appellate court found to be so low as to constitute a clear abuse of discretion. The State was granted leave to appeal to the supreme court and raised the issue as to what constitutes "reasonable" compensation under the circumstances. (*Johnson*, 87 Ill. 2d at 102.) The attorneys filed a cross-appeal requesting interest on any reasonable fee allowed by the trial court, dating from the time in which they were entitled to the fee until it was paid. (*Johnson*, 87 Ill. 2d at 106.) The court held:

> "Interest is generally allowed from the date a final judgment is entered. [Citation.] However, the [attorneys] never received a final judgment in terms of a dollar amount; the case was remanded by the appellate court to the trial court to determine a reasonable fee. As a result, there has been no final judgment upon which to base an award of interest. Consequently, on remand, interest should not be attached to any reasonable fee allowed by the trial court." *Johnson*, 87 Ill. 2d at 106-07.

■ The plaintiff had the choice to accept the remittitur or to have a new trial on damages alone. Thus, the amount of damages was undetermined until the plaintiff agreed to accept the remittitur, for unless the plaintiff agreed, a new trial on damages would have been held. We find that in this case there was no final judgment upon which interest could accrue until September 24, 1992. Accordingly,

we find that the trial court erred in awarding the plaintiff $342 in interest for the period of July 13, 1992, through August 27, 1992. Therefore, we reverse the award of interest and vacate that portion of the September 24, 1992, order awarding interest.

## III

■ Plaintiff presents the issue of whether the trial court erred in awarding remittitur. Plaintiff could not of right have taken appeal from the order of remittitur. A party who consents to a remittitur is bound thereby and is precluded from appealing the entry of the remittitur unless the opposing party appeals from the judgment. (*Anderson v. Greyhound Lines, Inc.* (1975), 34 Ill. App. 3d 643, 645, 339 N.E.2d 465; see also *Haid v. Tingle* (1991), 219 Ill. App. 3d 406, 416, 579 N.E.2d 913.) However, since defendants have taken appeal, plaintiff may raise the issue of remittitur to this court.

The determination of an adequate verdict is peculiarly within the province of the jury. (*Ball v. Continental Southern Lines, Inc.* (1977), 45 Ill. App. 3d 827, 360 N.E.2d 81.) A jury's verdict will not be determined to be excessive unless it is shown that the verdict is the result of passion and prejudice or the amount is so large as to shock the judicial conscience. (*Baier v. Bostitch* (1993), 243 Ill. App. 3d 195, 204, 611 N.E.2d 1103.) "However, if, after considering all the evidence, the trial judge concludes that the jury verdict is excessive, the judge may not allow the verdict to stand but must act to correct the injustice; and the failure to do so is, itself, error." *Haid v. Tingle* (1991), 219 Ill. App. 3d 406, 410, 579 N.E.2d 913.

"The practice of entering or ordering a remittitur has long been an accepted practice in Illinois and has been consistently acknowledged to be promotive of both the administration of justice and putting an end to litigation." (*McElroy v. Patton* (1970), 130 Ill. App. 2d 872, 877, 265 N.E.2d 397.) The court in *Haid v. Tingle* (1991), 219 Ill. App. 3d 406, 579 N.E.2d 913, stated:

"One of the manners by which the trial court can correct an excessive verdict is to order a remittitur. A remittitur is an agreement by the plaintiff to relinquish, or remit, to the defendant that portion of the jury's verdict which constitutes excessive damages [citations] and to accept the sum which has been judicially determined to be properly recoverable damages [citation]. The only alternative to a remittitur in a case where the verdict exceeds the damages properly proven [citations], and/or where the verdict can be accounted on the sole basis that the jury acted from some improper motive [citation], such as passion or prejudice [citation], is for the trial judge to order a new trial [citations]." *Haid*, 219 Ill. App. 3d at 411.

■ A remittitur is a judicial determination of recoverable damages and should not be construed as an agreement between or among the parties (*McElroy v. Patton* (1970), 130 Ill. App. 2d 872, 877, 265 N.E.2d 397), or as a concession by the plaintiff that the damages were excessive. (*Jensen v. Richardson* (1968), 93 Ill. App. 2d 237, 235 N.E.2d 397.) Although a trial court may refuse to enter judgment on a verdict, the plaintiff's consent is essential to the entry of a remittitur. The trial court must afford the plaintiff the choice of agreeing or refusing the entry of a remittitur, with the proviso that the plaintiff's refusal to agree to the entry of a remittitur will result in the ordering of a new trial. *Haid*, 219 Ill. App. 3d at 411.

■ We believe that the trial court properly found the jury verdict to be excessive and the result of passion and prejudice on the part of the jury. A review of the transcript discloses that there was no medical evidence to support the plaintiff's claim of loss of memory. In addition, plaintiff's counsel asked questions of Neaice Craft regarding the plaintiff's financial condition, such as whether the plaintiff was responsible for her own bills and whether her house was in foreclosure. After the trial court had sustained objections to this line of questioning of Neaice Craft, the plaintiff testified that her house had been in foreclosure and her car repossessed. The contested issues in this case were whether or not plaintiff was injured as a result of the automobile accident on October 11, 1989, and, if so, to what extent. Plaintiff's financial status, especially information that her house was in foreclosure, was completely irrelevant and extremely prejudicial to the issues in this case. This information could only serve to evoke unwarranted sympathy on the part of the jury. We also note plaintiff's counsel's remarks in closing argument, that the insurance company had attempted to chisel down Mr. Pletzke's claim of damages, was also irrelevant and would serve only to evoke the passion of the jury. For the foregoing reasons, we affirm the decision of the trial court granting a $20,000 remittitur in the present case.

Accordingly, for all the reasons set forth above, we find that the defendant lacks standing to appeal the trial court's decision not to grant a new trial on damages alone. We find that the trial court erred in ordering interest on the judgment prior to the plaintiff's decision to consent to the remittitur or consent to a new trial on damages. Finally, we affirm the decision of the trial court granting a remittitur in the present case.

Judgment affirmed in part; reversed in part.

GORDON, P.J., and COUSINS, J., concur.