STEVEN HANSEN, Special Adm'r of the Estate of Andrina Hansen, Deceased, Plaintiff-Appellee, v. BAXTER HEALTHCARE CORPORATION, Defendant-Appellant.

First District (3rd Division)   No. 1—98—3494

Opinion filed December 15, 1999.—Rehearing denied January 11, 2000.

William R. Quinlan, Michael I. Rothstein, Mary Patricia Benz, David M. Jenkins, and Brian J. Alesia, all of Quinlan & Crisham, Ltd., of Chicago, for appellant.

Kevin M. Forde, Janice R. Forde, and Kevin R. Malloy, all of Kevin M. Forde, Ltd., and Paul B. Episcope, John C. Erb, and David S. Jasmer, all of Law Offices of Paul B. Episcope, Ltd., and John Rokacz, of John Rokacz & Associates, all of Chicago, for appellee.

JUSTICE WOLFSON delivered the opinion of the court:

In the 1880s, in Germany, Otto Luer came up with the idea of a 6% taper as a way of putting a stopper in a bottle, keeping it there, and then getting it out again. Many years later, Luer's taper was used by hospital equipment manufacturers to ensure that one piece of IV set tubing would fit into another.

This case is about the IV sets manufactured by Baxter Healthcare Corporation (Baxter). And it is about the injuries and death suffered by Andrina Hansen (Andrina) when Baxter's IV set tubing came apart.

Andrina's estate and her survivors sued Baxter under a products liability theory. The jury found for the plaintiffs and returned a total verdict of $18,047,000.

Baxter raises several issues on appeal. We find sufficient evidence to support the jury's verdict as to liability and damages. We do, however, reduce the judgment to reflect a $2,800,000 setoff of a pre-trial settlement.

FACTS

In March 1991, Andrina was admitted to Mt. Sinai Hospital for stomach ulcer surgery. In preparation for surgery, Dr. Ricky Maddox (Dr. Maddox) inserted a catheter into Andrina's jugular vein. This catheter would allow doctors to transfuse blood or other fluids to Andrina. Andrina's catheter was connected to an IV tube manufactured by Baxter.

Baxter designs, manufactures, and distributes IV sets to hospitals nationwide. IV sets include tubing and connectors which link segments of tubing to medical devices or catheters placed into a patient's circulatory system. In 1991, Baxter offered two types of connectors: "friction fit" or "luer slip" connectors and "luer lock" connectors.

A luer slip connector consists of a tapered, "male" fitting which slips into a wider, "female" fitting to create a secure, leakproof connection. Baxter defined a luer slip connector as a product which, "when properly inserted, must provide a reasonably secure friction fit that will not leak or easily slide out of the catheter."

A luer lock connector consists of a luer slip connector with a threaded collar on the male fitting and a threaded flange on the female fitting which screw together to create a more secure connection. Baxter defined a luer lock connector as a product which "would provide a secure lock such that non-intentional separation of the Luer adapter from catheter *** could not occur."

Industry standards require luer slip connectors withstand $5^1/2$ pounds of separation force before disconnecting, and luer lock connectors must withstand eight pounds of force.

Luer slip connectors have been used for more than 40 years, and luer lock connectors were introduced within the last 20 years. After luer lock connectors became available, IV set producers, including Baxter, made all female fittings with flanges so these fittings could accommodate either luer slip or luer lock male fittings. At the time of Andrina's injury, Mt. Sinai used only luer slip connectors.

Dr. Henry Roztoczynski (Dr. Roztoczynski) successfully performed Andrina's surgery on March 7, 1991, and described her condition following surgery as excellent. Dr. Norbert Strohmayer (Dr. Strohmayer)

assisted Dr. Roztoczynski with the surgery and saw Andrina on his morning rounds the day after her surgery. She was responsive with good vital signs.

Later that morning, Dr. Strohmayer and Dr. Maddox heard a commotion and rushed to Andrina's room. The attending nurse, Colleen Golden (Golden), announced Andrina was having a seizure. As Dr. Strohmayer administered Valium to stop the seizure, he noticed blood pooling on Andrina's pillow. Andrina's catheter had become disconnected from the IV tube. As a result of this disconnection, an air embolism occurred. Air entered into Andrina's catheter and traveled to her brain, causing brain damage. Andrina became paralyzed. She died on June 4, 1995.

In 1991, Andrina's son, Thomas Hansen (Thomas), filed a medical malpractice claim against Mt. Sinai and Golden. Thomas later added survival and wrongful death claims against Baxter based on a products liability theory. Shortly before trial, all defendants except Baxter settled for $2,880,000. The trial court allocated 85% of the settlement, $2,448,000, to Thomas' wrongful death claims and 15% of the settlement, $432,000, to his survival claims.

On December, 24, 1997, Thomas filed an amended complaint against Baxter alone, presenting survival and wrongful death claims under both products liability and negligence theories. These claims proceeded to trial.

At trial, Dr. Roztoczynski testified he received a telephone call at home around 11 a.m. on the morning after Andrina's surgery and proceeded to the hospital. At the hospital Dr. Roztoczynski spoke with the intensive care unit chairman, Dr. Philip Zaret, and read Andrina's records. Dr. Roztoczynski learned Andrina's seizure began when Golden raised her from a prone to a sitting position. Dr. Roztoczynski described Golden's reaction:

> "Well, what happened, the nurse during the dangling [of] the patient as I said from flat to upright position patient becomes dizzy. Suddenly, you know, [Andrina] was short of the breath and becomes hypotensive so [Golden] knew that something happened.
>
> And in this time she was not exactly sure what's happened so she call [sic] Dr. Strohmayer, who came and he immediately find [sic] out that the patient had dislodged of [sic] IV tubing from the central venous catheter. And he put the patient in the left side position to put the right side up, he did the [head-below-feet] Trendelenburg position and start aspiration of the air which was inserted through the syringe."

Baxter did not object to this testimony.

Dr. Roztoczynski said the luer slip connector came apart when

Golden moved Andrina because "when the nurses would dangle [the patient's feet off the bed] under the tension [the] catheter got disconnected." Dr. Roztoczynski acknowledged luer slip connectors can easily disconnect. He testified he had seen such disconnections a "few times" and "quite often so many times" before Andrina's accident, though these previous disconnections carried less severe consequences.

While on staff at Our Lady of Resurrection Hospital two to three months before Andrina's accident, Dr. Roztoczynski noticed the hospital had started using luer lock connectors. Dr. Roztoczynski said he began using luer lock connectors "because I thought they were safe. *** [W]hen I saw this I said that's a great modernization to this [luer lock connectors], what we had before." Dr. Roztoczynski advocated luer lock connectors:

"[I]f you have a patient and the patient needs to be moved from one place to move and some tension is happened [sic], you know, taking the patient out of the bed and the tension will happen. These things happen many times, believe me. If you just have this kind of thing [luer lock connectors], and I'll say that this only one to prevent it just to change it for the luer lock adaption [sic], this thing will not happen."

However, Dr. Roztoczynski testified he never mentioned luer lock connectors to his colleagues at Mt. Sinai.

Dr. Maddox testified he was a second-year surgical resident at the time of Andrina's accident. Dr. Maddox said he placed a catheter into Andrina's jugular vein on the night of her surgery. But Dr. Maddox conceded he did not mate the IV tubing with the catheter: "I usually don't put the IV tubing in myself unless it's a trauma situation. But in situations like this I would let the nurses know *** that that is correct procedure using the catheter." Dr. Maddox agreed the nurses would start the IV—"get it all going and deliver the patient to surgery."

On the morning after Andrina's surgery, around 10 a.m., Dr. Maddox was in the intensive care unit discussing other patients when Golden announced an emergency situation. According to Dr. Maddox, he interpreted Golden's comment as "either [Andrina's] having a seizure or she's dropping blood pressure." When he entered Andrina's room, she was lying prone on her bed and she was unresponsive. Dr. Maddox said Dr. Strohmayer placed Andrina in the Trendelenburg position: "The reason was that the nurse's comment initially was that she was having a seizure, and we wanted to make sure that there was no cerebral event." Dr. Maddox said he was not familiar with luer lock connectors at the time of Andrina's accident.

Dr. Strohmayer testified he heard a commotion coming from

Andrina's room on the morning after her surgery, and he hurried to her room. According to Dr. Strohmayer, Golden was in Andrina's room. Dr. Strohmayer said he asked Golden what had happened:

> "If I remember the sequence correctly, she said she had sat up the patient and when the patient was sitting up, the patient became dizzy and then had a seizure and at that point we put her back to bed. And I think I got there when we were in the process of putting her back to bed. I don't know if she was already in the bed or getting in the bed; it was in that time frame."

Baxter did not object to this testimony.

Dr. Strohmayer testified he gave Andrina medication to stop her seizure and noticed blood pooling around her shoulder. Dr. Strohmayer then realized Andrina's IV tubing had disconnected from her catheter and immediately reconnected them. Dr. Strohmayer was concerned Andrina had an air embolism. At trial he explained:

> "At this point there was nothing else, she had been doing very well, so it would have to be some sort of acute event. The only thing that had happened within the past few minutes which could account for an acute event was the patient had—well, we saw the disconnected IV and she had been moved in and out of the bed, so we figured logically something happened during the transfer."

Dr. Strohmayer testified Mt. Sinai probably used luer slip connectors for all IVs at the time of Andrina's accident. Although he did not focus his attention on IV connectors, Dr. Strohmayer also knew about luer lock connectors at this time. He had seen both luer slip and luer lock connectors at other hospitals. Dr. Strohmayer did not read any medical literature about luer slip disconnections and did not remember specific instances of previous disconnections, but he suspected "it happened a few times." He said, "I'm sure we'd seen them in IVs get disconnected because people are moving and they pop out ***." Dr. Strohmayer acknowledged luer lock connectors were less likely to disconnect during patient movement and understood luer lock connectors provided more secure connections: "I just knew that it was screwed on so it's going to be harder to take off."

Dr. Donald Kuhlman (Dr. Kuhlman), an attending neurologist at Mt. Sinai in 1991, testified he consulted with Andrina's doctors after her accident. Dr. Kuhlman said he received Andrina's history when he arrived at the intensive care unit: "I got the history that there was a woman who had undergone an ulcer operation and seemed to be doing fine until they sat her up at the edge of the bed when she began having a seizure and became unresponsive. *** I was also told that they noticed that her central line had become disconnected ***." Baxter did not object to this testimony. Dr. Kuhlman noted raising Andrina

from a prone position could be significant to the disconnection because "that movement there is something which could have jostled things loose."

Dr. Edmund Donoghue, Cook County chief medical examiner, testified the IV disconnection caused an air embolism, which in turn caused brain damage to Andrina.

Cynthia Schiavo Pullinger (Pullinger), a group product manager for Baxter's IV products at the time of Andrina's accident, was called by Thomas as an adverse witness. Pullinger acknowledged luer lock connectors "could potentially be more secure. It's called a luer lock so it locks on." But she insisted both luer slip and luer lock connectors were safe products:

> "You have customer preference. And if a customer prefers one versus the other, they're both safe products, so you offer them what they want, you know, clinically what they decide that they need. So it's just like anything else. You offer a variety of products to fit the customer's requirements."

Pullinger concluded, "There are obviously customers that wanted friction fit. It was selling in the marketplace."

Birendra Lal (Lal), a Baxter engineer responsible for the production of IV tubing sets, was called by Thomas as an adverse witness. Lal said the design of the luer slip connector has not changed much in more than 40 years. According to Lal, luer slips are designed to meet industry standards, and they disconnect only with more than 5½ pounds of separation force. Luer locks disconnect with more than eight pounds of separation force. Regarding luer slips, Lal said, "if applied properly, they should not come apart." But he added, "these were designed to be detachable. So it will take five pounds of force to disconnect them. So the moment you exert more than five pounds, they will come apart. Five pounds is a lot of force." Lal said if a luer slip connector disconnected, "somebody must have made a mistake in the way they connected it."

Lal conceded Baxter's luer lock patent application referred to the danger of luer slip connectors disconnecting. Lal read the patent application: "Therefore, it's an object of the present invention [luer lock connector] to provide the Luer connection system in which an axillary slidable locking ring is prevented from inadvertent disengagement once it is properly engaged." When presented with a list of medical journal articles discussing cases of luer slip disconnections, Lal said Baxter would know of these articles.

Lal knew luer slip connectors were used with central venous catheters and luer lock connectors could help prevent disconnections: "Just the fact that there's another locking feature there to provide

*extra security, yes.* *** *By adding more security it does help.* *** I don't have any data, but common sense would suggest there could be less." Lal said luer lock connectors were "[d]efinitely more secure than the Luer slip." When asked why all male fittings do not include a threaded collar, Lal echoed Pullinger's testimony: "It's because the customers demand the Luer slip also. We put both Luer lock—We make this available to all the customers, Luer lock and Luer slips."

When called by Baxter, Lal said Baxter recommends using luer lock connectors in central venous catheters, but conceded this recommendation only appears on Baxter pumps. Lal also said Baxter leaves the clinical decision of choosing a connector to the hospital.

Margaret Foss (Foss), Baxter's vice-president of quality management, was called by Thomas as an adverse witness. Foss said she became aware of IV disconnections before 1982 when she worked as a nurse. Foss characterized IV disconnections as a "well-known" and "recognized" complication of IV therapy with luer slip connectors. Foss added, "It is common knowledge that a locking connection provides a more secure junction than friction fit or a slip fit. That is elemental. That's basic." Foss agreed luer lock connectors were developed to guard against disconnection. She also agreed the medical community knew about luer lock connectors at the time of Andrina's accident.

Foss said luer lock connectors should be used with central venous catheters: "I would have to say a friction fit is not adequate for use with a central line." Called by Baxter, Foss again said her experience taught her luer lock connectors were used for central venous catheters. But Foss did not say luer slip connectors were inferior to luer lock connectors: "I would not describe it that way. I would say that in their applications, friction fits meet all requirements clinically in providing a secure connection."

Mary Sandrick (Sandrick), a Mt. Sinai nurse who chaired the nursing products committee at the time of Andrina's accident, testified she knew the difference between luer slip and luer lock connectors in 1991. Sandrick had used luer lock connectors on central arterial catheters. Sandrick agreed luer slip connectors were "commonly familiar" to nurses. Sandrick said she had no trouble with luer slip connectors in the course of her nursing experience, but she noted they occasionally disconnected. According to Sandrick, Baxter never advised Mt. Sinai about the risks of luer slip disconnection, though she agreed she was aware of such risks before Andrina's accident.

LeBirdie Wilson (Wilson), Mt. Sinai's supervisor of supplies, processing, and distribution, testified she was unfamiliar with luer lock connectors at the time of Andrina's accident. Wilson said Mt. Si-

nai used luer slip connectors because, "We had always used them. No one had communicated any problems to me with the [IV tubing] sets." Wilson knew luer slip connectors could disconnect and had seen several disconnections in her nursing career.

Neil Sheehan (Sheehan), Thomas' engineering expert, testified about the problems associated with luer slip connectors:

> "When it gets put together, it is put together usually with the anticipation of it being at some point, taken apart. So there is some reluctance to jam that [male fitting] in [the female fitting] as hard as you can.
>
> There's also a variation in the size of the nurse. There are very small women, very small men. There are large women, large men. There's a complete range of the amount of force that's used [to connect the fittings], just based on the person ***.
>
> So on any given day, any given nurse could put together, you know, A, B, and then C and D; and they come out with very different [separation force] numbers when you went to pull it apart."

Sheehan said "an impact of any kind" could generate more than five and one-half pounds of separation force. He added a luer lock could withstand much more than 5½ pounds of force.

Sheehan testified the risk of luer slip disconnection was widely known and widely reported in the medical community. Sheehan found 20 to 30 articles in medical journals which described 70 cases of accidental luer slip disconnection from central venous catheter lines over a seven- to eight-year period before Andrina's accident. Sheehan said the risk of an air embolism from IV disconnection was common knowledge in the medical community.

Because an air embolism is so devastating but so preventable, Sheehan testified, "[I]n all cases, in all applications, Luer locks should be used as opposed to the antiquated Luer slip design." Sheehan said, "I believe that the Luer slip connection is not a safe design in any application." When asked why, Sheehan responded, "Because it can come apart. And I have not—I do not know of one IV connection that is one that you can permit it to be disconnected accidentally." Sheehan added luer slip connectors were particularly inappropriate for central venous catheters. Sheehan concluded luer slip connectors became obsolete when luer lock connectors became available.

Louis Rofrano (Rofrano), a Baxter field sales instructor at the time of Andrina's accident, testified as Baxter's first witness. Rofrano said, "from my experience starting in 1979 [the luer lock connector] was already a well-established product, it was in general use for specific applications, and people knew about it." Rofrano acknowledged Baxter's luer lock connector patent came in 1983, but added the luer

lock connector was "standard technology elsewhere." Rofrano would not have expected hospital personnel to ask for training on luer lock connectors. But Rofrano said a Baxter salesperson would say luer lock connectors reduce the risk of accidental disconnection if asked for a luer lock demonstration. However, Rofrano agreed Baxter sales representatives were not trained to "go out and tell customers about the risk."

Rofrano said Baxter sales representatives were not actively promoting luer lock connectors because hospitals would use their own judgment in choosing an IV connector. Rofrano repeated the theme used by the other Baxter representatives who testified at trial: "That decision is up to the hospital. *** They make the choice. *** We present them with whatever products we are able to manufacture that meets [sic] their requirements."

Dr. William Schumer (Dr. Schumer), chairman of the Mt. Sinai surgery department, testified the nursing committee approved the purchase of all devices used at the hospital. Dr. Schumer could offer only recommendations to the nursing committee, but the committee seeks his approval before implementing any purchasing decisions.

Dr. Schumer was aware of luer lock connectors before Andrina's accident, though he observed most hospitals used luer slip connectors. When asked why the hospital did not switch to luer lock connectors, Dr. Schumer said: "Well, they [luer slips] were being used because they were working at the time. We didn't have any trouble. If we connect these connectors together with friction, they usually hold very well. Depends on who puts it together." In 44 years of medical practice, Dr. Schumer had no experience with luer slip disconnections before Andrina's accident, although he was aware of the risks associated with disconnection. Dr. Schumer said all Mt. Sinai resident and intern physicians knew of these risks.

According to Dr. Schumer, the hospital did switch to luer lock connectors following Andrina's accident. In contemplating such a switch, Dr. Schumer did not need to study the medical journals. He testified, "Well, I had read literature prior [to the accident], so I knew about the background on the situation and I knew that Luer locks would probably be safer." Dr. Schumer continued:

> "It [disconnection] never happened to me so therefore I treated—I accepted friction connections [as safe]. ***
>
> However, I knew that they could come apart. There had been reports that these things would come apart, so I must—you know, my feeling at the time was that with my experience, I could still rely on friction connections. It's only after this episode that I recognized that we have to be more careful than we were before."

William McVay (McVay), Baxter's engineering expert, testified luer slip connectors are not unreasonably dangerous without a warning. McVay said luer slip and luer lock connectors have a propensity to disconnect to some degree: "They're both very low in their tendency to disconnect, but it's very difficult for me to find that there is a significant difference between the two in the tendency for disconnection."

According to McVay, luer locks do not eliminate the risk of IV disconnection. Instead, "[t]he Luer lock fitting simply adds a margin of safety over the Luer [slip] fitting." McVay said, "a safer approach would be to use a Luer lock with that particular central line." McVay reiterated, "I would believe that one would, if given the option, would use a Luer lock over a Luer slip ***." McVay testified luer slip connectors were not safe to use with central venous catheters, but Baxter had no duty to provide any warning.

At the close of the three-week trial, Thomas filed another amended complaint, substituting his brother Steven Hansen (Steven) as plaintiff and voluntarily dismissing the negligence counts. The jury returned an $18,047,000 general verdict in favor of Steven. On February 20, 1998, the trial court entered judgment on the jury's verdict, allocating 92% of the verdict, $16,547,000, to the survival claim and 8% of the verdict, $1,500,000, to the wrongful death claim.

Baxter filed a motion seeking a setoff of the entire $2,880,000 settlement. On March 11, 1998, the trial court allowed a setoff of only $1,932,000. On September 8, 1998, the trial court denied Baxter's posttrial motion.

This appeal followed.

DECISION

Baxter's appeal raises several issues, ranging from Baxter's legal duty to the trial court's setoff. We address these issues in turn.

1. Products Liability

Baxter contends its luer slip connector was not dangerous as a matter of law.

■ To recover on a products liability claim, the plaintiff must show an injury resulted from an unreasonably dangerous condition of the product which existed when the product left the defendant's control. *Hunt v. Blasius*, 74 Ill. 2d 203, 210, 384 N.E.2d 368 (1978). Whether a product is unreasonably dangerous is normally a question of fact for the jury (*Wille v. Navistar International Transportation Corp.*, 222 Ill. App. 3d 833, 842, 584 N.E.2d 425 (1991)), though whether a duty to warn exists is a question of law (*Modelski v. Navistar International Transport Corp.*, 302 Ill. App. 3d 879, 887, 707 N.E.2d 239 (1999)).

Unreasonably dangerous conditions include manufacturing defects, design defects, and failures to warn of a product's dangerous propensities. *Lamkin v. Towner*, 138 Ill. 2d 510, 528, 563 N.E.2d 449 (1990). This case involves allegations of a design defect and a failure to warn.

a. Failure to Warn

■ A duty to warn arises when a product manufacturer has greater knowledge of a product's dangerous propensities than a consumer has. *Kokoyachuk v. Aeroquip Corp.*, 172 Ill. App. 3d 432, 439, 526 N.E.2d 607 (1988); see *McColgan v. Environmental Control Systems, Inc.*, 212 Ill. App. 3d 696, 700, 571 N.E.2d 815 (1991). The purpose of product warnings is to apprise consumers of the product's dangers they don't know about, enabling them to take protective precautions. *Mazikoske v. Firestone Tire & Rubber Co.*, 149 Ill. App. 3d 166, 174, 500 N.E.2d 622 (1986). No duty to warn arises when the product's dangers are commonly appreciated. *Mazikoske*, 149 Ill. App. 3d at 174.

■ In medical device cases, the intended audience for product warnings is not the patients on whom these devices are ultimately used. Instead, Illinois employs the "learned intermediary doctrine." Under this doctrine, prescription drug and medical device manufacturers have a duty to warn physicians of a drug's or a device's dangerous propensities, and physicians, in turn, using their medical judgment, have a duty to convey any relevant warnings to their patients. See *Martin v. Ortho Pharmaceutical Corp.*, 169 Ill. 2d 234, 238, 661 N.E.2d 352 (1996); *Kirk v. Michael Reese Hospital & Medical Center*, 117 Ill. 2d 507, 517-18, 513 N.E.2d 387 (1987); *Pluto v. Searle Laboratories*, 294 Ill. App. 3d 393, 396, 690 N.E.2d 619 (1997); *Tongate v. Wyeth Laboratories*, 220 Ill. App. 3d 952, 958, 580 N.E.2d 1220 (1991).

In the context of the learned intermediary doctrine, then, a medical device manufacturer has no duty to warn physicians of a device's dangers which the medical community generally appreciates. *Proctor v. Davis*, 291 Ill. App. 3d 265, 277, 682 N.E.2d 1203 (1997), citing *Wooten v. Johnson & Johnson Products, Inc.*, 635 F. Supp. 799, 803 (N.D. Ill. 1986). The duty to warn analysis is objective. *Klen v. Asahi Pool, Inc.*, 268 Ill. App. 3d 1031, 1035, 643 N.E.2d 1360 (1994). If a manufacturer has no duty to warn, the device cannot be unreasonably dangerous for the manufacturer's failure to warn. *Proctor* is instructive.

In *Proctor*, a doctor injected a steroid into a patient's eye to correct the patient's blurred vision. The patient had an adverse reaction to the steroid, and his eye was eventually removed. The patient filed a products liability claim against the steroid's manufacturer, alleging

the manufacturer failed to warn physicians about possible risks associated with injecting the steroid into patients' eyes. The jury returned a verdict in favor of the patient, and the court denied the manufacturer's motion for judgment notwithstanding the verdict.

On appeal, we said, "In Illinois, there is no duty to warn of a risk that is already known by those to be warned." *Proctor*, 291 Ill. App. 3d at 277, citing *Kokoyachuk*, 172 Ill. App. 3d 432. We continued: "In the context of prescription drug litigation, this principle means that a drug manufacturer need not provide a warning of risks known to the medical community." *Proctor*, 291 Ill. App. 3d at 277. But after reviewing the record, we noted the "imbalance of access to information" about the adverse propensities of the steroid. *Proctor*, 291 Ill. App. 3d at 282-83. "Although it is assumed that physicians will keep abreast of current medical literature," some of the literature available to physicians was generated by the manufacturer and was misleading. *Proctor*, 291 Ill. App. 3d at 284.

We found, "There is no record evidence to support the hypothesis that the medical community knew of these dangerous propensities." *Proctor*, 291 Ill. App. 3d at 279-80. The manufacturer had a duty to warn because, "Doctors who have not been sufficiently warned of harmful effects of a drug cannot be considered 'learned intermediaries' ***." *Proctor*, 291 Ill. App. 3d at 283.

Unlike the medical community in *Proctor*, the medical community here knew the risks associated with the prescription product. Foss and Sheehan testified the risk of luer slip disconnection was commonly known by the medical community. The articles Sheehan found on luer slip disconnection reinforce this conclusion. Additionally, unlike the doctors in *Proctor*, the doctors here knew the risks associated with the product. Mt. Sinai's chairman of surgery, Dr. Schumer, and all the doctors treating Andrina knew luer slip connectors could disconnect and knew the grave risks associated with IV disconnections. Nurse Sandrick and nurse Wilson acknowledged they knew luer slips could disconnect.

■ We find, as a matter of law, Baxter had no duty to warn Mt. Sinai's doctors about risks the doctors and the medical community already were aware of. This issue should not have reached the jury.[1]

Extinction of the duty to warn theory does not end this case. The jury returned a general verdict. Neither party submitted special inter-

---

[1]We believe our analysis of legal duty to warn is consistent with Illinois law. For that reason, there is no need to determine whether there ever can be a causal relationship between an injury and a failure to warn about a danger that is well known in the appropriate community.

rogatories. We cannot know whether the jury's verdict was based on a duty to warn, a defective design, or both. The case went to the jury on both theories, each with its own instructions. Case and statutory law tell us when more than one theory is presented, the general verdict will be upheld if there was sufficient evidence to sustain either theory. *Witherell v. Weimer*, 118 Ill. 2d 321, 329, 515 N.E.2d 68 (1987); *Luther v. Norfolk & Western Ry. Co.*, 272 Ill. App. 3d 16, 23, 649 N.E.2d 1000 (1995); see 735 ILCS 5/2—1201(d) (West 1996).

### b. Defective Design

■ Baxter contends there was not enough evidence of a defective design to support a verdict based on that theory. We believe there was.

We have set out the evidence in some detail. It tells a story of a company that made and sold two kinds of IV sets—the luer slip and the luer lock. The luer slip could and did come apart inadvertently, even when properly connected, despite compliance with industries standards. Baxter knew that. In addition, nurses at times would, for convenience, loosely connect the luer slip. Baxter should have known that. If the practice can be characterized as abnormal, it also can be anticipated, and, therefore, objectively reasonable to foresee. See *Kerns v. Engelke*, 76 Ill. 2d 154, 165, 390 N.E.2d 859 (1979).

Baxter also knew the luer slip would be used with central venous catheters, creating a potentially dangerous situation for unsuspecting patients, the ultimate consumers. It should have come as no surprise to Baxter that patients move in bed. They sit up at times. Lines get caught and tangled. Again, "objectively reasonable to expect, not merely what might conceivably occur." (Emphasis omitted.) *Winnett v. Winnett*, 57 Ill. 2d 7, 12-13, 310 N.E.2d 1 (1974). See C. Chapman & T. Hoffman, Product Liability in Illinois, at II—2 (3d ed. 1999).

At the same time, Baxter made and sold a luer lock line that did not come apart inadvertently. The luer lock line cost only a few pennies more than the luer slip. The existence of the luer lock line takes out of the case any claim there was no feasible alternative design.

The question presented to the jury was whether the luer slip connector was "unsafe when put to a use that is reasonably foreseeable considering the nature and functions of the" connector. Illinois Pattern Jury Instructions, Civil, No. 400.06 (3d ed. 1995). That is, a product is defective "if it is not safe for such a use that can be expected to be made of it." *Dunham v. Vaughn & Bushnell Manufacturing Co.*, 42 Ill. 2d 339, 343, 247 N.E.2d 401 (1969).

The plaintiff's expert, Neil Sheehan, told the jury the luer slip connection is not a safe design. Why not? "Because it can come apart."

Sheehan was referring to unintentional disconnection, a failure of the line "to perform in the manner reasonably to be expected in light of [its] intended nature and function." *Dunham*, 42 Ill. 2d at 342.

At first blush, Sheehan's opinion seems too simple. But the law does not necessarily discourage simplicity. Our case law is grounded in a simple question posed by the Restatement: Was the product safe when put to its foreseeable use? Restatement (Second) of Torts § 402A (1965).

Based on testimony about the luer slip design, the jury could have found it posed an unreasonable risk of harm beyond that contemplated by Andrina as she lay in her hospital bed.

Here, the jury had additional evidence to consider—the feasible alternative design of the luer lock. We realize the existence of a safer design does not, as a matter of law, require a verdict that the luer slip was unreasonably dangerous. *Kerns*, 76 Ill. 2d at 166.

At the same time, it is well established the jury in a design defect case may consider evidence of "an alternative design which is economical, practical and effective." *Kerns*, 76 Ill. 2d at 162-63; *Murphy v. Chestnut Mountain Lodge, Inc.*, 124 Ill. App. 3d 508, 515, 464 N.E.2d 818 (1984); *Sutkowski v. Universal Marion Corp.*, 5 Ill. App. 3d 313, 319, 281 N.E.2d 749 (1972).

In *Derrick v. Yoder Co.*, 88 Ill. App. 3d 864, 410 N.E.2d 1030 (1980), the plaintiff lost an arm when he was thrown into a steel splitting machine's unguarded recoiler, an allegedly defective design. We allowed the jury to consider proof that a safety device which could have obviated the danger was available to the manufacturer-defendant at less than a prohibitive cost. *Derrick*, 88 Ill. App. 3d at 875. In this case, all the manufacturer, Baxter, had to do was look to its own catalogue.

In short, the evidence of defective design could be considered by the jury in both of the ways approved in *Palmer v. Avco Distributing Co.*, 82 Ill. 2d 211, 219-20, 412 N.E.2d 959 (1980): (1) evidence that Andrina could expect to use the luer slip without risk of harm; and (2) a connector that would prevent foreseeable harm without hindering its function or increasing its price had been designed.

Whether the jury used the "consumer expectation test" or a "risk/benefit analysis," or both—which it may do (see *Lamkin*, 138 Ill. 2d at 529; *Besse v. Deere & Co.*, 237 Ill. App. 3d 497, 501, 604 N.E.2d 998 (1992))—it decided the defective design issue against Baxter, and we cannot say that decision was against the manifest weight of the evidence.

## 2. Proximate Cause

Having concluded the jury could have found Baxter's design unreasonably dangerous, we do not see proximate cause as a serious issue.

Nurse Golden's account of the events leading to Andrina's injury was presented to the jury through Doctors Roztoczynski, Strohmayer, and Kuhlman. Of course, nurse Golden's statements were hearsay, but they went in without objection. The hearsay could be considered by the jury "and *** be given its natural probative effect." *People v. Williams*, 139 Ill. 2d 1, 15, 563 N.E.2d 431 (1990).

Here, nurse Golden spoke to the doctors shortly after the event, at a time when she would have no motive other than to report accurately. The jury was free to give the hearsay whatever weight it thought appropriate. See M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 801.8, at 740 (7th ed. 1999).

Nurse Golden offered the jury a fairly clear picture of what happened, certainly enough for the jury to infer an inadvertent uncoupling of the line took place when the nurse sat up the patient.

■■ ■ Evidence of proximate cause can be direct or circumstantial. *Tweedy v. Wright Ford Sales, Inc.*, 64 Ill. 2d 570, 575, 357 N.E.2d 449 (1976). Proximate cause can be inferred from an affirmative factual base. *Baltus v. Weaver Division of Kidde & Co.*, 199 Ill. App. 3d 821, 833, 557 N.E.2d 580 (1990). Liability may be found whether the defective design of the defendant's product is the sole or a contributing cause of a plaintiff's injury. *Besse*, 237 Ill. App 3d at 502, citing *Coney v. J.L.G. Industries, Inc.*, 97 Ill. 2d 104, 454 N.E.2d 197 (1983).

There was enough evidence here for the jury to find a defective design was a cause of the inadvertent uncoupling of a Baxter luer slip that was being used in a reasonably foreseeable manner, resulting in Andrina's air embolism and later brain damage. The trial court did not err when it refused to grant Baxter's motion for judgment notwithstanding the verdict due to failure to prove proximate causation.

## 3. Jury Instructions

Baxter challenges jury instructions, given and not given, on the duty to warn and defective design issues.

■ Because we hold the duty to warn claim should not have reached the jury, there is no need to consider the instructions given on that issue.

We have reviewed the nonpattern instructions offered by Baxter on the defective design issue. We find the trial court properly exercised its discretion in refusing these instructions. They were argumentative and incomplete. See *Swartz v. Sears, Roebuck & Co.*, 264 Ill. App. 3d

254, 267, 636 N.E.2d 642 (1993). The pattern instructions given the jury fairly and correctly stated the law on design defect. See *Baier v. Bostitch*, 243 Ill. App. 3d 195, 207, 611 N.E.2d 1103 (1993).

Baxter also complains about the trial court's refusal to instruct the jury on learned treatises: "Scientific medical treatises are not evidence or proof of statements contained therein."

In fact, journals were used at trial, without objection, for the nonhearsay purpose of proving the medical community's notice of complaints about luer slips. Because the duty to warn issue is out of the case, and because the instruction would have served no useful purpose, we conclude the failure to give Baxter's proposed instruction was not an abuse of discretion. See *Linn v. Damilano*, 303 Ill. App. 3d 600, 606-07, 708 N.E.2d 533 (1999).

### 4. Damages

Baxter contends the jury's verdict was excessive.

■ The determination of an adequate verdict lies particularly within the jury's province. *Carter v. Kirk*, 256 Ill. App. 3d 938, 947, 628 N.E.2d 318 (1993). A verdict falling " 'within the flexible range of conclusions which can reasonably be supported by the facts,' " will withstand judicial review. *Best v. Taylor Machine Works*, 179 Ill. 2d 367, 412, 689 N.E.2d 1057 (1997), quoting *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 470, 605 N.E.2d 493 (1992). This one does.

■ The jury heard testimony of Andrina's final four years of tortured existence. She could not speak or walk, she needed full-time nursing care, she lacked motor control in half her body, and she experienced excruciating pain at all times. Those and other dire consequences of line uncoupling persuade us we ought not to second guess the jury's award of damages.

### 5. Setoff

Baxter contends the trial court erred in refusing a lump-sum setoff of the pretrial settlement.

■ "A plaintiff is only entitled to one recovery and only one satisfaction for claimed injuries pursuant to one cause of action." *Readel v. Towne*, 302 Ill. App. 3d 714, 718, 706 N.E.2d 99 (1999). Under the Joint Tortfeasor Contribution Act (740 ILCS 100/2(c) (West 1996)), the amount of a settlement between a plaintiff and a settling tortfeasor is set off against any recovery the plaintiff may receive later from another nonsettling tortfeasor "for the same injury or wrongful death for which the tortfeasor was ultimately found liable." *Pasquale v. Speed Products Engineering*, 166 Ill. 2d 337, 368-69, 654 N.E.2d 1365 (1995).

■ When a case involves both survival and wrongful death claims, the allocation should be made according to the claim. *Readel*, 302 Ill. App. 3d at 719. That is, damages for the decedent's conscious pain and suffering should be allocated to the survival claim, while damages for the loss of benefits to the decedent's survivors should be allocated to the wrongful death claim. *Muro v. Abel Freight Lines, Inc.*, 283 Ill. App. 3d 416, 420, 669 N.E.2d 1217 (1996).

Apportioning the settlement amount among various claims rests within the trial court's discretion (*Muro*, 283 Ill. App. 3d at 419), but the court should evaluate the fairness and reasonableness of the allocation (*Readel*, 302 Ill. App. 3d at 721).

The trial judges apportioned the settlement and the verdict as follows:

|  | Wrongful Death | — | Percentage | Survival | — | Percentage |
|---|---|---|---|---|---|---|
| Settlement | $2,448,000 |  | 85% | $432,000 |  | 15% |
| Verdict | $1,500,000 |  | 8% | $16,547,000 |  | 92% |

Before trial, Baxter never objected to the court's settlement allocation. After trial, the court allowed Baxter to setoff the full $432,000 amount of the survival claim settlement and allowed Baxter to set off only $1,500,000 of the wrongful death claim settlement, leaving $948,000 of the settlement outside the setoff. Because we do not have a report of proceedings from March 11, 1998, we cannot determine whether the court articulated reasons for its allocation of the verdict.

In his brief, Steven says:

"Apart from the critical fact of timely asserting an objection to the settlement and allocation, plaintiff concedes that the Second District's decision in *Readel*, if followed by this Court, would require a set off of the entire amount of the pretrial settlement ($2,880,000) thus reducing the judgment to $15,167,000."

Baxter's failure to object to the settlement allocation waived any argument the settlement apportionment was unfair or unreasonable. *Readel*, 302 Ill. App. 3d at 717. But Baxter challenges the posttrial apportionment of the jury's verdict, not the pretrial settlement. The same three people who received the settlement proceeds recovered under both the wrongful death and the survival claim which proceeded to trial. Based on Steven's concession, as well as our unwillingness to allow a double recovery, we set off the full amount of the pretrial settlement.

## CONCLUSION

For the reasons we have set out above, we affirm the judgment in

favor of the plaintiff, modified by our setoff of the full amount of the pretrial settlement, resulting in a total judgment of $15,167,000.

Affirmed and modified.

CAHILL, P.J., and BURKE, J., concur.